IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| TIAWANDA D. HAMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:14-CV-111 (MTT) |
| | ) | |
| MACON BIBB COUNTY TRANSIT | ) | |
| AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Plaintiff Tiawanda Hampton, an African-American female, alleges she was fired by Defendant Macon Bibb County Transit Authority because of her race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* Before the Court is the Defendant's motion for summary judgment. (Doc. 35). For the following reasons, the motion is **GRANTED**.

### I.     BACKGROUND

The Plaintiff began working for the Defendant in 2007 as a bus operator. (Docs. 29 at 220:2-3; 36 at ¶ 1). Several months later, she was promoted to an executive assistant position. (Doc. 36 at ¶ 2). When Richard Jones became the Defendant's Chief Executive Officer and General Manager in July 2009, the Plaintiff began serving as his executive assistant. (Doc. 36 at ¶ 3). She did so until he fired her in April 2013. As discussed below, the Plaintiff was fired because of events that occurred during and following the day John Alligood, the Defendant's Human Resource Manager, brought his AR-15 rifle to work. (Docs. 30 at 24:15-22; 36 at ¶ 23). Alligood, who is Caucasian, was not fired. (Doc. 29 at 220:2-3).

When Alligood brought his gun to work on March 28, 2013, he first showed it to Sarita Thomas, the on-duty security guard who sits at a desk in the lobby outside of the Defendant's offices.  (Docs. 30 at 34:8-18; 33 at 11:17-12:4; 36 at ¶ 26).  Both Alligood and Thomas recall joking about the gun, with Alligood saying something like, "Don't piss me off today."  (Docs. 30 at 34:21-35:2, 36:10-22; 33 at 22:2-12).  Once inside the Defendant's office, Alligood showed his gun to several employees, including Jade Daniels, the Director of Operations, and June Slaughter, the Paratransit Manager. (Doc. 36 at ¶ 29).  While Alligood was showing Daniels his gun in her office, the Plaintiff walked by, saw it, and then left to report it to Thomas.  (Docs. 29 at 96:8-15, 122:22-123:4; 36 at ¶ 31).  The Plaintiff told Thomas that Alligood "had a big gun in the building and that [she] was scared, [she] felt unsafe, and [she] didn't feel comfortable being there."  (Doc. 29 at 123:13-15).

Thomas went to investigate while the Plaintiff stayed at Thomas's desk.  (Docs. 29 at 123:17-19; 33 at 32:11-12).  Thomas saw Alligood showing off his gun, returned to the Plaintiff, and asked her if she was not comfortable with what Alligood was doing. (Doc. 33 at 32:13-18).  The Plaintiff replied that she was not.  (Doc. 33 at 32:16-18). Thomas then asked the Plaintiff if she had talked to Jones, and she replied that she had not.  (Doc. 33 at 32:21-23).  The Parties dispute what happened next.  According to Thomas, she asked the Plaintiff if she would talk to Jones, and the Plaintiff replied that she would not call him.  (Doc. 33 at 33:10-12).  According to the Plaintiff, Thomas told her to call Jones, and she called his office phone but he did not answer.[1]  (Doc. 29 at 123:22-24).  In any event, the Plaintiff provided Thomas with Jones's cell phone number, and Thomas called Jones, who said he was "on the way" and would "handle it."

---

[1] Jones testified there was no message on his office phone and "there was no indication that [his] phone had ever been called."  (Doc. 31 at 45:14-21).

(Docs. 29 at 123:24-124:4; 33 at 33:10-21, 34:12-13).  According to the Plaintiff, Thomas then told her that "Jones [was] aware of [Alligood] bringing the gun [and] that [he knew] that [Alligood] [was] bringing the gun."[2]  (Doc. 29 at 124:12-14).

   While Thomas called Jones, the Plaintiff called Craig Ross, Chairman of the Board of Directors.  (Docs. 29 at 124:14-15; 33 at 74:9-11; 36 at ¶ 41; 40-1 at ¶ 41). After the Plaintiff finished talking with Ross, Daniels and Slaughter approached her. (Docs. 29 at 125:19-22; 37-1 at ¶ 8; 37-2 at ¶ 7).  According to the Plaintiff, they told her Jones "knew that [Alligood] was bringing the gun because he okayed it."  (Doc. 29 at 125:22-25).  The Plaintiff did not return to the Defendant's offices until Alligood was gone.  (Doc. 29 at 126:8-10).  Once he left, the Plaintiff returned, gathered her belongings, and left.  (Doc. 29 at 126:23-127:1).  The Plaintiff testified that she left because she "was still afraid" and she did not know "what this man [was] capable of doing."  (Doc. 29 at 127:2-4).

   Both the Plaintiff and Alligood returned to work the following day, a Friday, and Jones instructed them to write a statement about the incident.  (Docs. 29 at 168:7-20; 30 at 68:11-13).  According to Jones, Alligood did not have a reason for bringing his gun to work.  (Doc. 31 at 71:23-72:2).  Still, according to Jones, Alligood was "as apologetic as anybody I've ever seen that has committed a violation."  (Doc. 31 at 71:6-10).  Under the employee handbook, bringing a gun to work could result in either a ten-day suspension or termination.  (Doc. 36 at ¶ 54).  Alligood received a ten-day suspension. (Docs. 30 at 71:8-13, 72:2-18; 31 at 74:21-75:1).

   The following Monday, April 1, Jones asked to meet with the Plaintiff.  (Doc. 29 at 171:3-9).  In addition to the policies set forth in the employee handbook, Jones had the

---

[2] Jones denies that he knew Alligood was going to bring his gun to work or authorized him to do so.  (Docs. 31 at 43:21-44:1; 36 at ¶ 25).

authority to issue directives that employees were required to follow.  (Docs. 36 at ¶ 16; 40-1 at ¶ 16).  Jones believed the Plaintiff had violated his directive that all of the Defendant's employees must follow the chain of command and notify him directly—and not contact members of the Board of Directors—if there are any significant events at the Macon Bibb County Transit Authority.  (Docs. 31 at 106:1-4; 36 at ¶ 17; 40-1 at ¶ 17).  The Plaintiff admitted she knew about this directive, knew it was important to Jones, and knew she could be disciplined for not obeying it.  (Docs. 36 at ¶¶ 20-21; 40-1 at ¶¶ 20-21).  Jones also testified that he was concerned about the Plaintiff's violation because it indicated a "lack of trust."  (Doc. 31 at 106:24-107:5).  Thomas informed Jones that the Plaintiff said she would not call him, and Jones felt the need to find out why his executive assistant would say such a thing.  (Doc. 31 at 48:1-5, 76:18-25).  As his executive assistant, Jones "depend[ed] on her more than [he] [did] anybody else there." (Doc. 31 at 48:6-7).  Thus, Jones testified that the purpose of speaking with the Plaintiff was to "find out why she was uncomfortable calling me."  (Doc. 31 at 78:8-11).  He did not intend to discipline her.  (Doc. 31 at 68:5-6).

When the Plaintiff went back to Jones's office, she asked him if she could have a witness or record the conversation.  (Docs. 29 at 172:3-8; 31 at 88:7-8).  Jones told her to go back to her desk, and a few minutes later, he came back and said he had procured a witness.  (Doc. 29 at 172:8-14).  The witness was Slaughter, and according to the Plaintiff, she was "[h]is witness, not my witness."  (Doc. 29 at 172:12-17).  The Plaintiff had a problem with Slaughter being the witness because "they thought it all was a joke[,] [and] I didn't think it was a joke."  (Doc. 29 at 172:18-25).  Nevertheless, all three went into Jones's office and Jones asked the Plaintiff why she called Ross instead of him.  (Docs. 29 at 172:14-17, 177:11-14; 31 at 78:14-16).  The Plaintiff refused to

answer his questions, sometimes by sitting in silence and sometimes by stating words to the effect of "I refuse to answer that question." (Docs. 29 at 177:15-17; 31 at 111:22-112:11; 36 at ¶ 65; 40-1 at 65; 37-1 at ¶ 14).

The Plaintiff admitted it was reasonable for Jones to ask her why she did not follow his directive.[3] (Doc. 29 at 179:12-15). She also admitted she knew that by not answering Jones's questions, she was being insubordinate. (Doc. 29 at 48:25-49:2). However, the Plaintiff testified she did not answer Jones because she was scared and intimidated by Jones's heavy breathing and hitting on the desk. (Doc. 29 at 178:6-7, 179:16-180:3). Jones and Slaughter both claim that Jones was calm and did not raise his voice. (Docs. 31 at 78:12-13; 37-1 at ¶ 13). After the Plaintiff refused to answer Jones's questions, Jones instructed Slaughter to escort the Plaintiff to her desk and "to have her get her personal effects and to leave the building." (Docs. 29 at 181:13-14; 31 at 85:24-86:5; 37-1 at ¶ 15). Jones testified he did this because the Plaintiff refused to answer his questions. (Doc. 31 at 86:6-9). Slaughter understood Jones's statement "to mean that [the Plaintiff] had just been terminated." (Doc. 37-1 at ¶ 15). Jones too believed that he had just fired the Plaintiff, and he testified it was his intent to do so. (Docs. 31 at 113:2-9; 36 at ¶ 71). The Plaintiff, however, did not believe she had been fired, and she returned to work the following day, April 2. (Doc. 29 at 183:7-20).

As soon as Jones learned that the Plaintiff had returned to work on April 2, he asked that the Plaintiff be taken to the conference room. (Doc. 31 at 87:6-8). Jones testified the purpose of this second meeting was "to give her another opportunity" and that he was willing to, or was, "reconsidering" his decision to terminate her the previous

---

[3] During her deposition, the Plaintiff testified that she violated Jones's directive because she feared for her life, she felt like it was a safety issue, she felt like she had to notify the police officer on duty, and she felt like it was a police situation the police needed to handle. (Doc. 29 at 178:19-179:1).

day.  (Doc. 31 at 113:10-21, 114:12-18).  Jones asked the Plaintiff the same questions he asked the previous day.  (Doc. 29 at 193:9-13).  Again, the Plaintiff sat silently and refused to answer his questions.  (Doc. 29 at 189:24-25, 193:14-22).  Jones told the Plaintiff that if she did not respond, "it's considered insubordination … and is grounds for immediate termination."  (Docs. 36 at ¶ 78; 40-1 at ¶ 78).  After the Plaintiff refused to answer, Jones stated, "I have no other choice.  You are terminated."  (Doc. 36 at ¶ 86; 40-1 at 86).  The Plaintiff testified she refused to answer Jones's questions because she believed she had already been terminated.  (Doc. 29 at 190:2-25, 191:11-23).  Prior to going into the conference room, Slaughter had approached her and told her that Alligood said to turn in her keys and her last paycheck would be mailed to her.  (Doc. 29 at 184:12-22, 190:10, 191:18-23).

In considering the imposition of discipline, Jones considered factors like whether his employees intended to do wrong, whether they agreed they did something wrong, whether they promised they would not do it again, and whether they were willing to accept the consequences of their actions.  (Doc. 31 at 71:11-22, 97:5-16).  According to Jones, the Plaintiff "was unwilling to admit any fault [or] take any action to correct the issue that she had.  She refused to answer any questions even after she was told that that was grounds for insubordination and grounds for immediate termination."  (Doc. 31 at 99:5-12).  Alligood, on the other hand, had no ill intent, and the fact that he was apologetic was a mitigating factor.  (Doc. 31 at 71:6-22, 97:16-19).  Jones also testified this was the first time in his career that an employee had refused to answer his questions.  (Docs. 36 at ¶ 88; 40-1 at ¶ 88).  He testified that if Alligood had refused to answer his questions, he would have "terminated him on the spot."  (Doc. 31 at 98:10-11).

The Executive Committee of the Board of Directors, which had the authority to affirm, reverse, or modify Jones's decision to terminate the Plaintiff if it believed a change was warranted, retained a consultant, Dr. William Cummings, to independently review Jones's decision.  (Docs. 36 at ¶ 96; 40-1 at ¶ 36; 37-4 at ¶ 10).  Following Dr. Cummings's review, the Executive Committee unanimously decided to uphold the Plaintiff's termination.  (Doc. 37-4 at ¶ 16).  Jones hired Rhonda Lowe, who is African-American, to replace the Plaintiff as his executive assistant.  (Doc. 36 at ¶ 115; 40-1 at ¶ 115).

## II.   DISCUSSION

### A.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### B.  *McDonnell Douglas* Framework

A Title VII plaintiff may prove her case directly or circumstantially.  Here, there is no direct evidence of discrimination, so the Plaintiff must rely on circumstantial evidence.  The framework for analyzing circumstantial evidence to establish a prima facie case of discrimination is provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly depending on the nature of the claim.  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharm. Am., Inc.*, 702

F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (internal quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination. "The plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256). Put another way, "[a] plaintiff may … survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 F. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) (citation omitted).

### C.   Wrongful Termination

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case, the Plaintiff must show that: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position; (3) [she] suffered an adverse employment action; and (4) [she] was replaced by a person outside [her] protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." *Maynard v. Bd. of*

*Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

The Defendant argues the Plaintiff has failed to meet her prima facie case because she cannot show she was treated less favorably than a similarly-situated individual outside her protected class.  "When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'"  *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted); *see also Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." (citation and internal quotation marks omitted)).  The Plaintiff must be "similarly situated in all relevant respects" to the employee she identifies as a comparator.  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citation and internal quotation marks omitted).  In the Eleventh Circuit, "[t]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) (citation and internal quotation marks omitted).  "Misconduct merely 'similar' to the misconduct of the disciplined plaintiff is insufficient."  *Id.* (quoting *Burke-Fowler*, 447 F.3d at 1323 n.2).

The Plaintiff argues Alligood is a proper comparator because they were both supervised and disciplined by Jones and because their actions each "constituted a violation of company policy" and "arose from and were related to a single incident." (Doc. 40 at 12-13).  The Plaintiff argues she was fired for her single infraction of not

answering Jones's questions on April 1, while Alligood was not fired for his single infraction of bringing an assault rifle to the workplace.[4]  The Defendant argues the Plaintiff's misconduct is different in both quantity and quality.  Not only did she violate Jones's directive to notify him of significant events, but she was also insubordinate by refusing to answer his questions on April 1 and 2.  Moreover, Alligood had no ill intent, never tried to conceal his actions, admitted he made a mistake, apologized, and complied with Jones's investigation.  The Plaintiff, on the other hand, refused to acknowledge or explain her misconduct, never apologized, never took any responsibility for her actions, and refused to answer any of Jones's questions.

There are several key differences between the Plaintiff and Alligood.  At the outset, the Plaintiff and Alligood did not initially engage in misconduct that was "nearly identical." *Burke-Fowler*, 447 F.3d at 1325.  Whereas Alligood brought his gun to work, the Plaintiff failed to notify Jones of this significant event.  Moreover, the Plaintiff and Alligood responded differently to Jones's investigation of their misconduct.  Alligood expressed remorse for bringing his gun to work, while the Plaintiff refused to respond to Jones's questions regarding why she violated his directive.  *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1318 (11th Cir. 2003) (recognizing an employee's willingness to address deficient performance as a differentiating factor); *Riley v. Emory Univ.*, 136 F. App'x 264, 267 (11th Cir. 2005) (same).  And, as a result of her silence, the Plaintiff engaged in more misconduct than Alligood.  *See Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1313 (11th Cir.) ("Plaintiff's multiple instances of misconduct … may simply have been 'the straw that broke the camel's back.'" (citation omitted)), *superseded in part by* 151 F.3d 1321 (1998).  Finally, the Plaintiff's

---

[4] The Plaintiff argues the events that occurred on April 2 are irrelevant because she was terminated on April 1.  (Doc. 40 at 13).

insubordination was egregious.  Jones testified the Plaintiff was the first employee in his career that had refused to answer his questions, and this was particularly troubling to Jones because the Plaintiff was his executive assistant.  *See Maniccia*, 171 F.3d at 1369 ("It is quite reasonable for [the employer] to respond to such a breach of trust with the most serious punishment available.").

Even without considering the Plaintiff's insubordination on April 2, it is clear the quantity and quality of Alligood's misconduct is easily distinguished from that engaged in by the Plaintiff.[5]  Because they are not similarly situated in all relevant respects, the Plaintiff's prima facie case fails as a matter of law.[6]  Moreover, even assuming that the Plaintiff has established her prima facie case, she has not rebutted the Defendant's legitimate, non-discriminatory reason for terminating her employment, namely her insubordination.  (Doc. 35-1 at 13-14).  "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'"

[5] The Plaintiff argues Jones's "farcical investigation" illustrates that the Defendant's reason for treating Alligood differently—namely, that he "accept[ed]" his discipline—is a "sham."  (Doc. 40 at 12).  More specifically, she argues Jones did not question her "regarding Alligood brandishing a weapon or her fears of workplace violence," but focused solely on her "action in reporting the incident to [Ross]."  (Doc. 40 at 12).  "Based on this," the Plaintiff argues she "understood that Jones was not conducting an investigation into a report of a policy violation."  (Doc. 40 at 12).  It is not clear what the Plaintiff is arguing.  The Plaintiff admitted it was reasonable for Jones to question her regarding why she violated his directive to notify him of any significant events, and she admitted she knew that by not answering his questions, she was being insubordinate.  (Doc. 29 at 48:25-49:2, 179:12-15).  In any event, Alligood fails as a comparator not just because of how the Plaintiff and Alligood responded to Jones's questions, but because the quantity and quality of their misconduct is not "nearly identical."

[6] The Court recognizes that the *McDonnell Douglas* framework is not the "*sine qua non*" for a plaintiff to survive a summary judgment motion in an employment discrimination case and that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation marks and citation omitted).  However, the Plaintiff has not presented enough circumstantial evidence for a jury to infer intentional discrimination.  In fact, the Plaintiff admitted that the only basis for her race discrimination claim is comparing how she was treated to how Alligood was treated.  (Docs. 29 at 218:12-18; 36 at ¶ 91; 40-1 at ¶ 91).  She also admitted that there are no other facts supporting her claim.  (Doc. 29 at 218:19-21).

*Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation omitted).  The Plaintiff admitted she refused to answer Jones's questions, she knew she was being insubordinate by refusing to answer his questions, she knew Jones believed she was being insubordinate by refusing to answer his questions, and she was terminated for refusing to answer his questions.  (Doc. 29 at 48:25-49:2, 177:15-17, 210:1-16).  Therefore, the Plaintiff has failed "to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [her] [termination] was pretextual." *Rioux*, 520 F.3d at 1278.

### III.   CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (Doc. 35) is **GRANTED.**

**SO ORDERED**, this 27th day of May, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL
UNITED STATES DISTRICT COURT
